### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANGELA T.,

                Claimant,

        v.

MARTIN O'MALLEY,
Commissioner of Social Security,

                Respondent.

No. 21 C 5553

Magistrate Judge Jeffrey T. Gilbert

### MEMORANDUM OPINION AND ORDER

Angela T.[1] ("Claimant") appeals the final decision of Respondent Martin O'Malley,[2] Commissioner of the Social Security Administration ("Commissioner"), denying her application for disability insurance benefits. For the reasons set forth below, Claimant's Brief in Support of Reversing the Decision of the Commissioner of Social Security [ECF No. 15] ("Claimant's Brief") is denied, and the Commissioner's Motion for Summary Judgment [ECF Nos. 16, 17] ("Response") is granted.

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Martin O'Malley became the Commissioner of the Social Security Administration on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## BACKGROUND

On April 27, 2021, following a remand by the Appeals Council, the Administrative Law Judge ("ALJ") denied Claimant's application for Title II benefits and granted Claimant's application for Title XVI supplemental security income, concluding Claimant has been disabled beginning on March 28, 2018. (R.14-37). The Appeals Council declined review (R.1-6), leaving the ALJ's decision as the final decision of the Acting Commissioner of Social Security reviewable by this Court pursuant to 42 U.S.C. § 405(g). *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## DISCUSSION

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). "When reviewing a disability decision for substantial evidence, we will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it." *Warnell v. O'Malley*, 97 F.4th 1050, 1052-53 (7th Cir. 2024) (internal quotation marks and brackets omitted). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020)

2

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The Commissioner must consider whether: (1) the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any listed impairment; (4) the claimant retains the residual functional capacity ("RFC") to perform her past relevant work; and (5) the claimant is able to perform any other work existing in significant numbers in the national economy. *Id.*; *see Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since December 1, 2016, the alleged onset date of her disability. (R.17). At step two, the ALJ found that for the period between December 1, 2016 and March 27, 2018, Claimant had the severe impairments of alcohol abuse, alcoholic lever disease with portal hypertension, and obesity. (*Id.*) At step three, the ALJ found that for the period between December 1, 2016 through March 27, 2018, Claimant's impairments, including the substance use disorder, met Listing 12.04. (R.18-21). However, the ALJ found that if Claimant stopped her substance use, she would not have an impairment or combination of impairments that meets or medically equals

the severity of a Listing. (R.21). The ALJ stated Claimant did not have a medically diagnosed musculoskeletal impairment during this period and the evidence did "not establish the inability to ambulate effectively, but rather, that the claimant did not use an assistive device to ambulate." (R.21). The ALJ also noted that Claimant "has not been diagnosed with fibromyalgia per the standards set by the regulations." (R.21-22). The ALJ further considered Claimant's obesity and found it did not, in combination with another impairment, meet the requirements of a listing. (R.22). Also at step three, the ALJ concluded that Claimant's mental impairments, without substance abuse, considered singly and in combination, did not meet the criteria of a listing. (R.22-24). At step four, the ALJ found that for the period between December 1, 2016 to March 27, 2018, Claimant was unable to perform any past relevant work but has the RFC to "perform light work" with certain limitations. (R.24-28). At step five, the ALJ found that for the period between December 1, 2016 to March 27, 2018, if Claimant stopped her substance abuse, jobs existed in significant numbers in the national economy that Claimant could perform, and thus she is not disabled. (R.29-30).

The ALJ also determined that for the period beginning March 28, 2018, which is the date on which Dr. Lovinger issued her opinion (R.34) and signed off on her exam notes (R.3493) as more fully discussed below, and continuing thereafter, Claimant had the severe impairments of "residual effects of the claimant's long standing alcohol abuse, including alcoholic lever disease with portal hypertension," degenerative changes of the lumbar spine, Baker's cyst of the left knee, and obesity.

4

(R.31). The ALJ determined at step four that as of March 28, 2018, Claimant had the RFC to perform sedentary work with certain limitations. (R.31-36). Finally, at step five, as to the later time period beginning on March 28, 2018, the ALJ found there were no jobs that exist in significant numbers in the national economy that Claimant can perform. (R.37).

Accordingly, the ALJ concluded Claimant was not disabled prior to the date last insured (June 30, 2017), but that Claimant became disabled on March 28, 2018 and continued to be disabled through the date of the ALJ's decision. (R.37).

Claimant raises two main arguments challenging the ALJ's decision, including (1) substantial evidence did not support the ALJ's "bright line demarcation of disability on March 28, 2018" because evidence showed Claimant's physical impairments limited her to sedentary work by the date last insured (June 30, 2017); and (2) substantial evidence did not support the ALJ's evaluation of Claimant's subjective symptoms. Claimant's Brief [ECF No. 15].

## A. Substantial Evidence Supports ALJ's Opinion That Claimant Was Not Disabled Prior to March 28, 2018

Claimant raises a number of arguments in support of her position that the ALJ's finding that Claimant's disability did not begin prior to March 28, 2018 was not supported by substantial evidence. The Court addresses each of Claimant's arguments in this regard below.

First, the ALJ considered the opinion of a treating physician, Dr. Lovinger, in finding Claimant limited to sedentary work as of March 28, 2018, but did not otherwise find Dr. Lovinger's opinion "generally supportable, consistent, and

persuasive," noting the "opinion does not relate back to any period before March 28, 2018" and "the additional limits given are not adequately supported by the doctor's own records of (*sic*) the other evidence in the record." (R.34). Claimant says because Dr. Lovinger treated Claimant for eight months prior to when her opinion was issued, it stands to reason that Dr. Lovinger "based on her opinion on that treatment history." Claimant's Brief [ECF No. 15] at 6. Claimant cites to over three hundred pages of Dr. Lovinger's treatment records, generally claiming "[t]he evidence the ALJ cited in support of March 28, 2018, was the same as or similar to evidence from before that date." [*Id.*] Essentially, Claimant argues the ALJ erred in not considering Dr. Lovinger's opinion as evidence of Claimant's limitations prior to March 28, 2018.

As an initial matter, Claimant has not identified specific medical records that purportedly align with medical findings in the later time period to support her contention that the contents of over three hundred pages of Dr. Lovinger's treatment records presents "the same or similar" evidence as compared to what the ALJ considered in limiting Claimant to sedentary work as of the date of Dr. Lovinger's opinion. This generalization does not come close to identifying specific evidence to support Claimant's contention that the ALJ failed to consider substantial evidence to support her claim. A claimant bears the burden of bringing forth evidence to support her contentions both before the ALJ and on appeal, and Claimant has not done so here. In addition, the medical records Claimant does cite appear to relate primarily to mental health treatment rather than Claimant's physical impairments. Claimant's Brief [ECF No. 15] at 6 (citing R.1466-1750).

Moreover, although Dr. Lovinger treated Claimant for eight months before issuing her opinion, that does not automatically mean Dr. Lovinger's opinion applies to Claimant's limitations throughout the entire treatment period or earlier. Dr. Lovinger does not indicate as much in her opinion. The Seventh Circuit has rejected arguments akin to Claimant's here, namely that a finding of limitations at a later point in time necessarily means those same limitations existed earlier, reasoning "[t]his argument is both illogical and," as is also the case here, "inconsistent with the record." *See Penrod on behalf of Penrod v. Berryhill*, 900 F.3d 474, 477–78 (7th Cir. 2018) (rejecting argument that "because [claimant's] heart problems proved fatal in 2015 they must have been disabling in 2012 and 2013" where record evidence showed that while heart condition existed in earlier time period, it was controlled with medication and claimant "does not explain how any latent heart problems imposed functional limitations before [claimant's] date last insured").

The ALJ noted Dr. Lovinger's opinion did not relate back to the earlier time period and Claimant does not contradict this finding with any citations showing Dr. Lovinger's opinion describes Claimant's limitations before March 28, 2018. Claimant's Brief [ECF No. 15] at 6; *see also* (R.36). Moreover, the ALJ found "[a]s of the date of Dr. Lovinger's opinion . . ., the record demonstrates a greater problem with standing and walking," noting Claimant "was receiving help obtaining a bus pass because of her difficulty walking." (R.35-36). For all these reasons, the Court is not persuaded by Claimant's argument that Dr. Lovinger's opinion evidenced physical limitations restricting Claimant to sedentary work prior to March 28, 2018.

Second, Claimant identifies evidence from prior to March 28, 2018, other than in Dr. Lovinger's treatment notes, that she says shows "physical health issues limited her to sedentary work by June 2017," the date last insured. Claimant's Brief [ECF No. 15] at 7. Overall, Claimant argues medical evidence shows the impairments the ALJ found further limited Claimant to sedentary work as of March 28, 2018 (degenerative changes of the lumbar spine and Baker's cyst of the left knee) existed earlier, including before the date last insured, and Claimant also contends this was the case with respect to her fibromyalgia.

As discussed below, most of Claimant's evidence was from *after* the date last insured (June 30, 2017). Just as was the case with Dr. Lovinger's opinion, Claimant does not explain how those reports address Claimant's functional limitations during the period after the alleged disability onset date of December 1, 2016, and before the date last insured. *See* Claimant's Brief [ECF No. 15] at 9 (primarily citing reports of Claimant's complaints of pain in 2018 and later, Dr. Velis' report from December 2017, and Claimant's function report from October 2017); *see also* [*id.*] at 13 (citing Dr. Velis' December 2017 report, Dr. Lovinger's March 2018 opinion, and February 2018 report from UIC Health Information Management). Claimant also identifies medical records of potentially relevant symptoms from *before* her disability onset date, but those symptoms appear to have resolved before the relevant period. Claimant's Brief [ECF No. 15] at 7. Moreover, Claimant does not address much of the evidence relied on by the ALJ as showing that Claimant's condition had worsened by March 2018, thus warranting the additional restriction to sedentary work.

As addressed in more detail below, there were some factual errors in the ALJ's conclusions, including the statement that there was no objective evidence in the record of degenerative changes of the lumbar spine or of a Baker's cyst in the left knee prior to March 28, 2018. (R.18). In the Court's view, these errors ultimately are harmless. While there may be evidence that these impairments existed prior to March 28, 2018, Claimant does not identify medical evidence that would support her argument that she was functionally restricted to sedentary work during this earlier time period or that she was unable to perform light work with the additional restrictions of the RFC. The ALJ acknowledged Claimant's degenerative spine impairment may have manifested earlier, but concluded there was no evidence of additional functional limitations beyond those imposed by the RFC for that period. (R.18). In addition, while the ALJ may have failed to note the earlier diagnosis of a Baker's cyst in Claimant's left knee, the ALJ nonetheless considered the evidence regarding Claimant's knee pain during that period and concluded the objective evidence did not support functional limitations beyond those imposed in the RFC.

Turning to the specific evidence identified by Claimant, Claimant points to evidence regarding an enlarged liver with fatty infiltration but does not explain how that indicates a limitation to sedentary work before March 2018. *See* Claimant's Brief [ECF No. 15] at 7. Claimant also says "[i]maging showed soft tissue density in her left knee in October 2017, and osteoarthritic changes in her right shoulder (*sic*) December 2017." Claimant's Brief [ECF No. 15] at 7, but Claimant fails to explain why this imaging (as to which Claimant does not provide any citation) requires a

limitation to sedentary work. Claimant also does not explain why such reports from October 2017 support a limitation to sedentary work back to the alleged onset date (December 1, 2016) or before the date last insured (June 30, 2017).[3]

Nevertheless, as noted above, there is evidence of Claimant's left knee pain from a Baker's cyst earlier than March 28, 2018. *See* (R.3499-3504 (December 5, 2017 record from Dr. Lovinger stating "Assessed: Baker's cyst, left knee")). This is factually inconsistent with the ALJ's finding that the Baker's cyst did not materialize until after March 28, 2018. (R.18 ("The record does not show evidence or diagnosis of . . . a Baker's cyst of the knee until after March 27, 2018"); R.31-32). Even with this factual error as to when Claimant was first diagnosed with a Baker's cyst, the ALJ nevertheless considered and reasonably discounted evidence from October 2017 through December 2017 regarding Claimant's knee pain. Although the ALJ did not note the finding of a cyst, the ALJ cited the December 5, 2017 record from Dr. Lovinger and noted this report stated Claimant's knee pain had improved. (R.26 (citing Ex. 25F/159); *see* R.3499-3504 (reporting "improved left knee pain," that

---

[3] Although it is unclear whether Claimant asserts this stems from a condition in her shoulder, Claimant suggests she was unable to fulfill the light work requirement of lifting ten pounds, stating "the ALJ indicated that in January 2018, [Claimant] could only lift 8 pounds," but Claimant does not provide any citation in support. Claimant's Brief [ECF No. 16] at 11-12. The ALJ did, however, refer to Claimant's testimony in February 2021 that "she could lift one gallon of milk in each hand" which is about eight pounds. (R.25); Reply [ECF No. 20] at 11. "The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." SSR 83-10. Beyond her testimony about lifting milk gallons, Claimant does not identify any medical evidence that she was unable to frequently lift or carry objects weighing up ten pounds. Based on this minimally supported argument, the Court cannot conclude the ALJ's light work RFC for the period before March 28, 2018 was inconsistent with evidence about Claimant's lifting abilities. The Court further notes that lifting was only minimally addressed in the parties' briefing, which primarily focused on evidence related to Claimant's ability to walk and stand.

Claimant had "seen an orthopedist for her knee" and received a knee injection which provided some relief but still has "some medial pain," and "[y]our cyst has improved"). The ALJ also cited records of visits related to knee pain in October 2017, but noted "imaging of claimant's left knee showed preserved joint space." (R.25 (citing Ex. 15F)).[4] The ALJ noted Claimant was unable to get an MRI of her knee at that time because "she was told she was too large for the MRI machine." (R.25 (citing Ex. 25F/164, a report from an October 24, 2017 visit to Dr. Lovinger)). The ALJ observed x-rays from December 2017 "of the claimant's left knee showed no abnormality." (R.26 (citing Ex. 7F/5)).[5]

Thus, while there may be some discrepancy in terms of when Claimant was first assessed with a Baker's cyst in her left knee, the ALJ considered the evidence regarding Claimant's left knee pain and discounted it due to objective imaging reports and reports of improvement with treatment during the period before March 2018. More importantly, Claimant does not explain how evidence of a Baker's cyst and pain in her left knee from late 2017 is relevant to her functional limitations at the alleged onset date of December 1, 2016 or before the date last insured of June 30, 2017.

---

[4] This appears to be the left knee imaging showing "soft tissue density" referenced by Claimant without citation. Claimant's Brief [ECF No. 15] at 7. Claimant does not address the ALJ's consideration of this report, including the findings of preserved joint space, "[v]ague tiny rounded soft tissue density in the region of the lateral meniscus," and "no acute fracture or dislocation." (R.25; R.2106 (October 12, 2017 imaging of left knee)).

[5] Claimant also cites a report dated January 15, 2018 from a rheumatologist reporting Claimant complained of left knee pain and swelling for 4-5 months and assessed her with a "small non tender baker's cyst" in her left knee. (R.1440-1445; see Claimant's Brief [ECF No. 15] at 9 (citing report at R.1441 but with respect to "bilateral heel spurs," which are not addressed in the report)). Although Claimant does not address this finding, the report notes that Claimant's left leg pain "may be related to bakercyst." (R.1440-1445.)

Accordingly, the Court will not re-weigh the evidence as to Claimant's knee pain that the ALJ reasonably addressed and finds any error as to the Baker's cyst is harmless.

Claimant also points to evidence that she used a walker for six months in 2016, but this occurred before the alleged onset date in December 2016 and appears to have resolved by that time. The ALJ acknowledged Claimant's testimony about using a walker, but also referenced findings that Claimant was able to ambulate effectively and without any assistive devices from after the alleged onset date, and before and after the date last insured (June 30, 2017). (R.25-26 (citing March 2017 examination where Claimant "ambulated without difficulty"); R.26, R.28 (citing Dr. Velis' examination in December 2017 as reporting Claimant "was able to ambulate without assistive device"). Claimant asks the Court to reject the ALJ's findings based on this evidence because "[a] person . . . does not use a walker for months without significant physical issues impairing her ability to walk, or go to physical therapy for muscle weakness and pain without cause." Claimant's Reply to Defendant's Response and Motion for Summary Judgment [ECF No. 20] ("Reply") at 4. Claimant's speculation about the ongoing significance of her earlier use of a walker is not a sufficient basis for the Court to reject the ALJ's reasonable conclusion based on actual evidence of Claimant's ability to walk without an assistive device after the alleged onset date.

With respect to the later period, the ALJ identified evidence that Claimant's ability to stand and walk had worsened as of March 28, 2018. (R.31 ("[o]n March 28, 2018, the claimant began expressing greater concerns with daily standing and walking" including "pain and weakness in her right hip and thigh when walking,"

and citing examination findings that Claimant was "hobbling," and x-rays showing a bone spur)). The ALJ compared Claimant's inability to sustain standing and walking after March 28, 2018 to her reported abilities in 2017. In May 2018, the ALJ noted Claimant "now complained of right-sided heel pain, as well as pain with increased ambulation. The claimant now had significant difficulty with walking, prolonged standing, and stairs, whereas before she had generally only reported pain with walking long distances, and the examiner now noted that the claimant had limited activity tolerance and generalized weakness" and "[t]he claimant received an injection for left knee pain"; in June 2018, Claimant was "still unable to extend her left knee"; in July 2018, "[t[he examiner noted [Claimant] was hobbling," Claimant's "lower left extremity was swollen and tender," and Claimant "was assessed with a Baker's cyst of the left knee"; in February 2019 and again in June 2019, "the examiner noted [Claimant] was hobbling," and in June 2019, Claimant was assessed with "patellofemoral disorder of the left knee and discussed physical therapy" (R.32-33 (internal citations omitted); *see also* R.35-36). While Claimant concedes "the record supports the part of the ALJ's decision that determined [Claimant] was limited to sedentary work on March 28, 2018 and after," she does not address the ALJ's findings that evidence from this later period reflected a worsening of Claimant's ability to stand and walk. Claimant's Brief [ECF No. 15] at 5. The Court may not second guess the ALJ's determination in that regard.

Claimant also argues degenerative disc disease is a progressive condition that worsens over time, pointing to a CT scan from December 2016 showing "degenerative

changes within the visualized spine." Claimant's Brief [ECF No. 15] at 7. This CT scan does appear literally inconsistent with the ALJ's conclusion that "[t]he record does not show evidence or diagnosis of degenerative disc disease of the lumbar spine . . . until after March 27, 2018." (R.18). Nevertheless, the ALJ acknowledged the "slow-moving nature of" degenerative disc disease and that it "could be possible" that Claimant's "degenerative disc disease of the lumbar spine [was] severe before March 27, 2018," but reasoned even if Claimant's spine impairment was severe prior to March 28, 2018, "the evidence before this date does not persuade me that the claimant would be more limited" than the light work with limitations RFC set by the ALJ. (R.18, R.31). In the Court's view, the ALJ's conclusion is reasonable notwithstanding the failure to consider the CT scan evidence. Claimant does not identify evidence showing how this CT scan translated into a functional limitation to only sedentary work. *See Morales v. O'Malley*, 103 F.4th 469, 470 (7th Cir. 2024) ("It is not enough to criticize the ALJ's decision about her functional capacity to work. She must point to evidence compelling the conclusion that the adverse disability decision lacks substantial support in the record."); *Matthew M. v. O'Malley*, 2024 WL 1530393, at *5 (N.D. Ill. Apr. 9, 2024) ("Plaintiff does not identify what limitations related to his back problems that the ALJ failed to include in the RFC. . . Where no medical source opined that Plaintiff's diagnosis affected his functioning, Plaintiff's conclusory argument alone does not establish reversible error.") (citing, among other decisions, *Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014)).

14

Claimant also does not address the evidence identified by the ALJ as showing Claimant's back condition had worsened after March 28, 2018. (R.31-33 (at examination on March 28, 2018, Claimant's lumbar spine was tender and she had positive straight leg raise testing"; "x-ray from April 2018 is the initial objective radiographic testing showing that the claimant has degenerative disc disease of the lumbar spine, loss of disc space, and facet atropy"; as of June 2018, Claimant "was getting physical therapy for her back and hip"; and reports that Claimant complained of back pain in February 2019, June 2019, and July 2020).[6]

Claimant then argues the consultative exam by Dr. Velis supports a restriction to sedentary work "on or before that exam date of December 6, 2017." Claimant's Brief [ECF No. 15] at 7.[7] Claimant says "[a] job in the light work category can require a good deal of walking or standing, and/or operating arm or leg controls, with frequent lifting or carrying" and requires the ability to perform substantially all of these activities. [*Id.*] at 7-8 (citing 20 C.F.R. § 404.1567(b)). On Reply, Claimant says Dr. Velis stated his opinion "could support a finding of sedentary work," but Dr. Velis' report does not actually contain such an opinion; rather, Claimant cites to an excerpt

---

[6] As reflected in the discussion above, the Court disagrees with Claimant that the ALJ merely summarized the evidence without analyzing or weighing it in connection with the ALJ's RFC determinations. *See* Reply [ECF No. 20] at 9.

[7] The Court notes Claimant filed her Title II application and her Title XVI application for supplemental security income on September 11, 2017, alleging a disability onset date of December 1, 2016 for both. (R.14). Although Claimant identifies evidence from after the filing date and before March 28, 2018 in her briefing, she does not argue that her disability onset date should be adjusted for purposes of her Title XVI claim to some date within that time period. (R.37 (finding for purposes of the Title XVI supplemental security income claim that Claimant has been disabled beginning on March 28, 2018)).

from the Appeals Council's initial remand order raising questions about Dr. Velis' report. Reply [ECF No. 20] at 8 (citing R.191-192, which noted "clinical findings observed by [Dr. Velis] could support a limitation to sedentary work as of that date" and finding the prior ALJ opinion "does not resolve the discrepancy between the consultative examiner's findings and the residual functional capacity for light work"). Accordingly, the issue presented is whether the ALJ adequately addressed whether Dr. Velis' opinion was consistent with the light work RFC prior to March 28, 2018.

With respect to Dr. Velis' findings, Claimant says Dr. Velis "diagnosed . . . degenerative joint disease in her knees," Claimant's Brief [ECF No. 15] at 7, but the ALJ discounted this assessment based on contemporaneous normal x-ray findings. (R.28 ("the claimant was assessed with degenerative joint disease of the knees. (7F/4) Yet an x-ray performed in connection with the consultative examination showed a normal left knee with no evidence of fracture or dislocation and well-maintained joint space.")). By contrast, with respect to the period after the ALJ's established onset date of March 28, 2018, the ALJ noted multiple instances in the record where Claimant experienced significantly reduced mobility in her left knee. (R.31-33).

Claimant also says Dr. Velis noted Claimant "could only sit for two hours and stand for 10-15 minutes," Claimant's Brief [ECF No. 15] at 7, but this is a reference to Dr. Velis' summary of Claimant's reported complaints, rather than a clinical impression. (R.1406). To that end, the ALJ discussed Dr. Velis' findings that "claimant has an elevated body mass index and observed that claimant had difficult maneuvering herself on and off the examination table," but also noted Dr. Velis

reported "claimant had no problem with weight bearing in general on examination, and her gait was wide-based and slow but she did not use an assistive device." (R.28). While Claimant is correct that light work may require "a good deal of walking or standing," *see* 20 C.F.R. § 404.1567, the ALJ considered the scope of light work required by the regulations, acknowledging it "generally requires standing and walking," but also "generally no walking for numerous blocks at one time." (R.27). Claimant does not appear to argue that the ALJ's legal interpretation that the light work regulations do not require the ability to walk for multiple blocks at one time was erroneous.

Also with respect to Dr. Velis' opinion, Claimant says the ALJ erred in finding Claimant's fibromyalgia was not a medically determinable impairment and therefore failed to consider fibromyalgia symptoms in determining Claimant could perform light work. Claimant's Brief [ECF No. 15] at 9-11. In particular, Claimant says the ALJ erred in not crediting Dr. Velis' opinion confirming "her fibromyalgia diagnosis" because the ALJ failed to consider the 2010 American College of Rheumatology criteria for fibromyalgia in assessing Dr. Velis' opinion. Claimant's Brief [ECF No. 15] at 10-11.[8]

Claimant may be correct that the ALJ failed to consider one of the two diagnostic criteria for fibromyalgia. The ALJ only addressed whether Claimant had "at least 11 positive tender points" on Dr. Velis' examination, noting Dr. Velis found

---

[8] Claimant incorrectly asserts the ALJ found Claimant had the severe impairment of fibromyalgia after March 28, 2018. Reply [ECF No. 20] at 7. The ALJ did not find Claimant had an impairment of fibromyalgia even in this later time period. (R.31).

"claimant had 'few' tender points." (R.28). *See* SSR 12-2p at 2-3 ("we may find that a person has a [medically determinable impairment] of [fibromyalgia] if he or she has" all three of the criteria listed in the 1990 ACR Criteria . . . or all three of the 2010 ACR Preliminary Diagnostic Criteria."); *Christine R. v. Comm'r of Soc. Sec.*, 2024 WL 1173743, at *4–5 (C.D. Ill. Feb. 5, 2024) ("The three 1990 ACR criteria are (1) a history of widespread pain, (2) at least 11 positive tender points on physical examination, and (3) evidence that other disorders that could cause the symptoms were excluded. The three 2010 ACR criteria are the same as the 1990 ACR criteria except that the second criterion only requires repeated manifestations of six or more fibromyalgia symptoms.") (internal citations omitted). At minimum, as Claimant observes, the ALJ did not explain why Dr. Velis' examination did not satisfy the 2010 criteria of six or more fibromyalgia symptoms and the Court may not consider the Commissioner's post hoc explanation for why that may be so. Reply [ECF No. 20] at 6-7; *compare Christine R.*, 2024 WL 1173743, at *4–5 (no error where "ALJ did not address" the 2010 criteria but "provided reasons for why Plaintiff failed to meet the criteria according to both the 1990 and 2010 ACR criteria").

The Commissioner argues any error in this regard was harmless because two state agency consulting doctors determined Claimant had fibromyalgia and nevertheless found Claimant could perform light work, including the state agency opinion relied on by the ALJ in crafting the RFC for light work with additional restrictions. Response [ECF No. 17] at 8. The Court agrees. The ALJ relied on the opinions of two state agency consultants, Dr. Gonzalez and Dr. Hinchen, who both

found Claimant had fibromyalgia and opined that Claimant could perform light work with additional restrictions before March 28, 2018. (R.28; R.122-131; R.134-149). *See Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) ("This error could conceivably be harmless if the ALJ indirectly took obesity into account by adopting limitations suggested by physicians who were aware of or discussed Arnett's obesity."); *Antoinette A. v. Comm'r of Soc. Sec.*, 2022 WL 567834, at *5 (C.D. Ill. Feb. 24, 2022) ("That the ALJ sufficiently considered the full extent of limitation posed by Antoinette's impairments is bolstered by the ALJ's consideration of the State medical consultants' opinions" who "were aware that Antoinette alleged RA and fibromyalgia and nevertheless opined that she remained capable of a range of unskilled light work with postural and environmental limitations").[9]

It is true, as Claimant argues, that these doctors noted they had insufficient evidence to evaluate Claimant prior to June 2017 (the date last insured). Reply [ECF No. 20] at 8. But the absence of an opinion that Claimant was able to perform light work before the date last insured is not sufficient to satisfy Claimant's burden to identify evidence of her functional limitations. Claimant had the burden of establishing her disability - as relevant here, to show she was limited to sedentary

---

[9] Similarly, even if Claimant is correct that the ALJ improperly focused on whether fibromyalgia was a medically "diagnosed" rather than a medically "determinable" impairment, any such error would be harmless because the ALJ considered the opinions of the agency doctors who assessed Claimant's functionality while considering her fibromyalgia symptoms. Claimant's Brief [ECF No. 15] at 8; Reply [ECF No. 20] at 5-6. For this same reason the Court is not persuaded by Claimant's argument that the ALJ's opinion has "deep logical flaws" because "the ALJ mostly adopted the State agency opinions in formulating the RFC" yet "specifically rejected their conclusions that [Claimant] suffered from fibromyalgia." Claimant's Brief [ECF No. 15] at 10. The relevant issue is whether the light work RFC was adequate to address any fibromyalgia symptoms.

work due to fibromyalgia or her other impairments before the date last insured. Claimant says Dr. Velis' December 2017 opinion "confirmed a previous fibromyalgia diagnosis of approximately 6 months prior," but this is not evidence that fibromyalgia limited her to sedentary work six months before Dr. Velis' examination. Claimant's Brief [ECF No. 15] at 9. Moreover, Claimant does not explain how she could have been unable to perform light work due to her fibromyalgia *before* June 2017, notwithstanding the opinions of two state doctors she could perform light work despite her fibromyalgia *after* that date.[10]

Claimant also does not identify evidence supporting additional limitations due to her fibromyalgia in the relevant period. Claimant says she "had significant widespread pain in all her extremities, hips and shoulders," but does not cite medical evidence in support of this assertion from before the date last insured. Instead, she refers only to Dr. Velis' findings in December 2017 after the date last insured. Claimant's Brief [ECF No. 15] at 6 (citing R.116-117); [*id.*] at 10-11. Similarly, Claimant asserts "[s]he had symptoms of muscle pain, fatigue, depression, abdominal

---

[10] Claimant also argues the ALJ should have retained an independent medical expert to determine the disability onset date. Claimant's Brief [ECF No. 15] at 13. On Reply, Claimant concedes the ALJ was not required to call an expert, but says it was necessary here because the state agency doctors had insufficient evidence to evaluate Claimant's impairments before the date last insured. Reply [ECF No. 20] at 10. As the Commissioner notes, an ALJ has discretion to decide whether expert evidence is necessary. Response [ECF No. 17] at 9-10. Claimant did not request an expert opinion at the hearing and does not explain why the evidence was insufficient to make the disability determination. Moreover, again, "[i]t was [claimant's] burden, not the ALJ's, to prove that she was disabled," *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017), and to "identify what evidence the ALJ overlooked or discounted." *Morales*, 2024 WL 2794055, at *2.

pain, memory issues, and muscle weakness for years," but again, does not identify supporting medical evidence. Claimant's Brief [ECF No. 15] at 10-11.[11]

Claimant points to a referral for physical therapy in 2015 for "weakness, balance, and overall strengthen," but does not identify any evidence linking this to fibromyalgia, nor does she explain why a PT referral in 2015 evidences Claimant's functional limitations as of the alleged onset date of December 1, 2016. Claimant's Brief [ECF No. 15] at 2 (citing R.912). Similarly, Claimant says she underwent physical therapy treatment for "bilateral leg weakness" from April to July 2016, but does not identify any physical therapy referrals for almost the entire year before her date last insured (June 30, 2017) or at any point between her alleged onset date (December 1, 2016) and March 28, 2018. [*Id.*] By contrast, the ALJ notes examples of physical therapy referrals for Claimant's back and leg pain in June 2018, June 2019, and July 2020, during the period when the ALJ found the evidence supported the more limited RFC of sedentary work. (R.32-33).[12]

In sum, Claimant asserts the record supports a limitation to sedentary work before the date last insured, and that Dr. Velis' exam in particular "revealed considerable clinical findings that indicate the Plaintiff can only do sedentary work,"

---

[11] Claimant cites her complaints of a history of chronic leg pain during what appear to be mental health intake interviews, as well as the Function Report she completed in October 2017. Claimant's Brief [ECF No. 15] at 6 (citing R.116-117, R.1328, R.1362). The ALJ's consideration of Claimant's subjective symptoms is addressed below.

[12] Claimant criticizes the ALJ for relying on a normal musculoskeletal evaluation from a gastroenterology examination in January 2017 in support of the RFC, asserting "[t]his exam was clearly not focused on [Claimant's] musculoskeletal system, but instead on her gastrointestinal symptoms." Claimant's Brief [ECF No. 15] at 13. This amounts to an improper request for the Court to re-weigh the evidence considered by the ALJ.

Reply [ECF No. 20] at 7-8, but the ALJ considered all this evidence including Dr. Velis' findings and reached a different conclusion. The ALJ also identified medical records from after March 28, 2018, which showed worsening of Claimant's condition. Although Claimant views this evidence differently than the ALJ, that is not a basis for the Court to second guess the ALJ's findings. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) ("We do not reweigh the evidence or substitute our own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review."). For all these reasons, the Court must defer to the ALJ's finding that more severe functional limitations were not warranted until the later date (March 28, 2018). *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

**B. Substantial Evidence Supports ALJ's Assessment of Claimant's Subjective Symptoms and Complaints**

Claimant argues the ALJ's assessment of her subjective symptoms and complaints was not supported by substantial evidence. Claimant's Brief [ECF No. 15] at 13-15. Claimant says the ALJ improperly considered Claimant's credibility and failed to consider her testimony before deciding the scope of the RFC. [*Id.*] at 14. The Commissioner responds that the ALJ provided sufficient explanation for why she discredited Claimant's testimony about her subjective symptoms, including discounting Claimant's statements based on findings in objective medical records, conservative treatment recommendations, Claimant's daily activities, and the opinions of the state agency doctors. Response [ECF No. 17] at 11-12.

"An ALJ's evaluation of a claimant's subjective symptom statements and complaints is afforded 'special deference' and will be upheld unless it is 'patently wrong.'" *Maria S. v. Kijakazi*, 2023 WL 7130376, at *7 (N.D. Ill. Oct. 30, 2023) (quoting *Summers*, 864 F.3d at 528 and citing *Burmester*, 920 F.3d at 510 (7th Cir. 2019) and *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "Social Security Regulation 16-3p outlines a two-step process for an ALJ to follow when evaluating a claimant's subjective symptoms. First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce his or her symptoms. Next, the ALJ must evaluate the intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." *Maria S.*, 2023 WL 7130376, at *7 (internal quotation marks and citations omitted). The ALJ "must explain her subjective symptom evaluation in such a way that allows the Court to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Charles B. v. Saul*, 2020 WL 6134986, at *6 (N.D. Ill. Oct. 19, 2020) (quoting *Murphy*, 759 F.3d at 816). And the standard is clear that a court can "overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is 'patently wrong.'" *Id.* (quoting *Burmester*, 920 F.3d at 510).

In the Court's view, the ALJ's evaluation of Claimant's subjective symptoms was not patently wrong. The Court disagrees with Claimant's assertion that the ALJ did not "include observations that [Claimant] has better functioning on examinations

than her subjective statements indicated." Reply [ECF No. 20] at 11. Although the ALJ may not have stated her conclusion in that precise manner, the ALJ said enough for the Court to infer that was the ALJ's conclusion. Immediately following the ALJ's discussions of the Claimant's complaints of pain, the ALJ referred to contemporaneous normal medical reports, activities of daily living, and/or recommendations for conservative treatment. As described further below, the ALJ's analysis was sufficient to satisfy the deferential standard on review.[13]

For example, the ALJ described Claimant's testimony at the September 2019 hearing that "she is unable to work due to chronic pain, muscle weakness, and difficulty standing and sitting" but in the same paragraph noted "claimant reported that she does chores at her place of residence like serving dinner, cleaning showers, and dusting," while also acknowledging "she has trouble with larger chores at times." (R.24-25). Although Claimant says the ALJ only considered Claimant's daily

---

[13] Claimant says the ALJ's conclusion that Claimant's statements were "not credible to the extent they are inconsistent with the [RFC] assessment" was improper and "meaningless boilerplate" language. Claimant's Brief [ECF No. 15] at 14. The Court understands the Claimant to argue the ALJ's phrasing suggests she compared Claimant's statements to the RFC rather than evaluating Claimant's subjective symptoms as compared to the objective record. As the Seventh Circuit explained, "discounting [a claimant's] subjective complaints as 'not entirely consistent' with the evidence—a formulation akin to one ('not entirely credible') that we have identified as 'meaningless boilerplate' . . . is meaningless only when the ALJ gives no legitimate reasons for discrediting the claimant's testimony." *See Lacher v. Saul*, 830 F. App'x 476, 478–79 (7th Cir. 2020) (concluding "[t]he ALJ's rationale here was thin, but it was adequate to reflect her conclusion that the objective medical evidence and Lacher's daily activities did not corroborate his subjective symptoms"). Awkward phrasing aside, and as described in more detail below, here the ALJ provided sufficient explanation for the Court to conclude the ALJ found the objective evidence to be inconsistent with Claimant's subjective description of the persistence and intensity of her symptoms.

activities in terms of her mental functioning, Claimant does not address the ALJ's reference to these household tasks. Reply [ECF No. 20] at 12.

The ALJ discussed Claimant's complaints of knee pain in October 2017, but then described normal imaging of her left knee showing preserved joint space. (R.25). The ALJ addressed Claimant's complaints of knee pain in combination with her obesity, noting "[h]er weight puts strain on her weight bearing joints and also makes postural maneuvers more challenging," and stating "I have factored in these limitations into her [RFC]." (R.26). The ALJ specifically stated she imposed the additional limitations in the light work RFC "to account for the claimant's obesity coupled with complaints of knee pain, though imaging showed preserved joint space." (R.26-27). The ALJ also described another instance where Claimant complained of "severe left knee pain worsened by walking" in October 2017, but noted "she was instructed to take Naprosyn [*sic*] one to two times daily, ice her knees three times per day" as well as "to try gentle stretching" and "use an Ace knee brace." (R.25-26). Claimant says "the ALJ did not tie those treatment measures to a conclusion that her significant knee pain . . . were not supported by evidence." Reply [ECF No. 20] at 12. The Court disagrees. In context, the ALJ's reference to these treatments is part of the rationale for discounting Claimant's knee pain during the relevant period. Moreover, the ALJ cited reports that Claimant's knee pain had improved in December 2017, which Claimant does not address. (R.26).[14]

---

[14] Claimant suggests the ALJ did not adequately consider Claimant's testimony that she was unable to lift more than 8 pounds. Claimant's Brief [ECF No. 15] at 12; Reply [ECF No. 20] at 11. As Claimant acknowledges, however, the ALJ noted Claimant's testimony that she "could lift one gallon of milk in each hand." (R.25). Although Claimant says the ALJ did not

The ALJ also compared Claimant's testimony regarding her limited ability to walk to contrary findings in the record. The ALJ noted Claimant testified at the September 2019 hearing "it is hard for her to go up staircases, and she has to go one stair at a time" and at the February 2021 hearing that "she could walk one block in twenty minutes in the snow." (R.25). The ALJ acknowledged Claimant said "sometimes she could not walk more than two or three blocks" but noted she "appears to have fewer problems at other times." (R.26). The ALJ considered examinations reporting Claimant could ambulate effectively, "had no problem with weight bearing in general," did not use an assistive device, "had a notably steady gait," and where Claimant "complained of muscle weakness, joint pain, and ankle pain, but that these problems occurred when she was walking for a 'long time'." (R.25-26 (internal citations omitted)). For these reasons, the ALJ concluded the objective record showed Claimant had pain when "walking long distances" or "more than two to three blocks" but "this limitation was not prevalent." (R.28-R.29); *see also* R.36-37 (Claimant "complained of difficulty standing and walking before March 28, 2018; however, she only reported that she 'sometimes' had difficulty walking longer distances, such as two or three blocks, which is insufficient to prohibit light work" or require a limitation

---

expressly state she did not believe Claimant's testimony based on examinations showing normal strength, the ALJ cited a March 2017 examination where Claimant denied muscular weakness and a February 2018 examination where "Claimant complained of pain in her shoulders, but there was no swelling" and "[o]n examination, the claimant had mild proximal weakness of her shoulders and forearms bilaterally." (R.26). As discussed above, Claimant did not identify evidence as to any lifting restrictions, and the ALJ considered Claimant's testimony about lifting milk and objective evidence regarding her shoulder pain and shoulder/arm weakness. For these reasons, the Court is not persuaded by Claimant's argument that the ALJ did not sufficiently address Claimant's testimony about lifting.

to sedentary work). Accordingly, the Court finds the ALJ reasonably discounted the Claimant's subjective statements about walking based on what the ALJ viewed as inconsistent findings in the record. Where the ALJ analyzes the record evidence in this way and reaches a conclusion that is supported by that evidence, it is not the Court's role to reweigh the evidence and come to a different conclusion.[15]

For all these reasons, the Court finds the ALJ sufficiently explained why Claimant's "statements concerning the intensity, persistence and limiting effects of her symptoms" were inconsistent with the ALJ's analysis of the objective medical record and the conservative treatment of Claimant's symptoms. (R.25-29). The ALJ permissibly considered the extent to which Claimant's complaints about pain and other limitations were inconsistent with medical evidence. *See Tina S. v. Kijakazi*, 2022 WL 3700837, at *3 (N.D. Ill. Aug. 26, 2022). The Seventh Circuit has stated that it "would not reverse the credibility determination as long as the ALJ provided at least one reason to support the finding." *Schrank v. Saul*, 843 F. App'x 786, 789 (7th Cir. 2021). The ALJ provided sufficient reasons to support her findings and the Court will not, and cannot under the law, second guess the ALJ's conclusion. For these reasons, the Court is not persuaded by Claimant's argument and finds that the ALJ's assessment of Claimant's subjective complaints is supported by the record.

---

[15] As the discussion above demonstrates, the ALJ did not "exclusively" rely on imaging to discount Claimant's reports of pain, *see* Claimant's Brief [ECF No. 15] at 14; rather, the ALJ considered reports of Claimant's improved condition and abilities during examinations.

## CONCLUSION

For the reasons set forth above, Claimant's Brief in Support of Reversing the Decision of the Commissioner of Social Security [ECF No. 15] is denied, and the Commissioner's Motion for Summary Judgment [ECF Nos. 16, 17] is granted. The decision of the Commissioner is affirmed.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: July 16, 2024